**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANDREW DUFFY, GEORGE ADAMS, GREGG HARDER, CHRISTOPHER JACKMAN, JASON LEE, JOSE ORDAZ, VINCENT RUGGIERO, and SOHAIL SHAH, individually and on behalf of all others similarly situated,** | ) ) ) ) ) ) ) | |
| **Plaintiffs** | ) ) | **No. 09 C 1746** |
| **v.** | ) ) | **Judge Rebecca R. Pallmeyer** |
| **THE TICKETRESERVE, INC., d/b/a INC., FIRSTDIBZ.COM, an Illinois corporation,** | ) ) ) ) ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant The Ticket Reserve, Inc., doing business as FirstDIBZ.com, operates an "online marketplace," in which internet users can buy, sell, and trade options to purchase tickets to sporting events, paying Defendant a fee for each transaction.   Plaintiffs are customers of the online marketplace who allege that they were defrauded by other users in several exchanges in which they attempted to secure tickets to the 2009 SuperBowl.   On behalf of themselves and those similarly situated, Plaintiffs assert various fraud and breach of contract claims against Defendant, who allegedly promised that the website was safe and secure.   Defendant moves to dismiss all claims, asserting that they are barred by various provisions of the contract that Plaintiffs signed when they began using the website.   For the reasons explained below, Defendant's motion to dismiss is granted in part and denied in part.

**BACKGROUND**

**A.    The Ticket Futures Market**

For purposes of this motion, the court presumes that the allegations of Plaintiff's Amended Class-Action Complaint are true.   Defendant The Ticket Reserve, Inc. ("TTR" or "FirstDIBZ") is a

corporation organized under the laws of Illinois with its principal place of business in Illinois. TTR operates FirstDIBZ.com, a website marketplace in which consumers may reserve advance purchasing options for tickets to sporting events, concerts, and other occasions. (Compl. ¶ 14.) As the court understands it, the website essentially operates as a futures market for tickets; consumers may buy, sell, and trade purchasing options (dubbed "DIBZ" by the website) for future events on a speculative basis. According to the website's User Agreement, "a 'DIBZ' is an instrument which: (i) gives the holder the right to purchase a product or ticket to a known or possible DIBZ event, the occurrence of which may be known or is contingent upon one or more factors and (ii) obligates the holder to purchase the product or ticket if the event is scheduled to occur." (*Id.* at ¶ 18; Ex. A to Compl. at 1.) As an example, a confident fan of the Chicago Cubs could visit the website and purchase a "DIBZ" for Game 1 of the 2011 World Series at Wrigley Field. In the event that the Cubs overcome their decades-long World Series drought,[1] the happy fan would then be guaranteed the right to purchase the ticket for Game 1 at face value. (Compl. at ¶ 17.) Should the Cubs disappoint, the DIBZ-holder would receive nothing and would lose the money she paid for the DIBZ. (*Id.* at ¶ 16.)

The website offers two marketplaces in which customers may purchase DIBZ and, as the user agreement explains, TTR's "roles vary in each." (*Id.* at ¶ 19; Ex. A to Compl. at 2.) The first marketplace, referred to as the "FirstDIBZ-supplied" or the direct marketplace, allows purchasers to buy DIBZ directly from TTR. (*Id.*) For DIBZ purchased in the direct marketplace, "[TTR] stands

---

[1]         The Cubs last appeared in the World Series in 1945. As team lore has it, during Game 4 of that series, Cubs officials ejected fan Billy Sianis and his pet goat from Wrigley Field. Sianis, a Greek immigrant who owned a local tavern, had purchased a box seat for the goat as a publicity stunt. While Sianis and his goat initially entered the ballpark without incident, team owner Phillip Knight Wrigley subsequently insisted upon the goat's removal because of the animal's objectionable odor. As Sianis and the goat were escorted out, the furious pet owner was heard to mutter, "The Cubs, they ain't gonna win no more." The Cubs went on to lose the Series and have not been back since. Many fans have since attributed the Cubs' decades of futility to the "Curse of the Billy Goat." *See, e.g.,* Steve Gatto, DA CURSE OF THE BILLY GOAT: THE CHICAGO CUBS, PENNANT RACES, AND CURSES (2004).

responsible for the authenticity of Listings registered on FirstDIBZ." (Ex. A to Compl. at 2.)  The second marketplace, referred to as  the "uDIBZ" or the "consumer-supplied" marketplace, gives DIBZ-holders the option of buying, trading, or selling their DIBZ in exchanges with other website users.  In the consumer-supplied marketplace, "FirstDIBZ acts as an exchange only in allowing users who want to buy Listings to find Listings from registered users who want to sell Listings." (*Id.*) Presumably, as the likelihood of a particular occurrence becomes more or less probable, the resale value of the DIBZ for that event would increase or decrease.  Thus, if the Cubs advanced to the National League Championship Series in 2011, a DIBZ-holder who purchased her Cubs World Series DIBZ at the start of the season would be able to resell it to another Cubs fan for a substantial profit.  In this way, the website serves as a market not only for fans who genuinely wish to attend sporting events but also for speculators seeking to make money based on predictions about the outcomes of sporting events.[2]  The website generates its revenue both by selling DIBZ directly and by charging users a transaction fee for DIBZ sold or traded between users.

Before they engage in any transaction on the FirstDIBZ.com website, all customers are required to register by submitting their credit card information and agreeing to the FirstDIBZ.com User Agreement.  (Compl. ¶ 21.)  The User Agreement, as explained in more detail below, is a contract between TTR and every individual user of the website.  (*Id.* at ¶ 22.)  Each registered user is also provided with an "online wallet" account, in which funds representing the profits garnered by reselling DIBZ are stored.  (*Id.* at ¶ 23-24.)  Upon request, TTR permits customers to withdraw funds from their online wallet accounts in the form of a check payment.  (*Id.* at ¶ 25.)

**B.    Plaintiffs' Contract and Fraud Claims**

---

[2]       The parties have not addressed whether the service provided by FirstDIBZ.com runs afoul of either prohibitions on sports gambling or securities and exchange regulations.  For the time being, the court assumes that the activities conducted on the site are not unlawful.  The court notes that Illinois has specifically exempted ticket brokers who sell tickets on properly registered websites from state prohibitions on ticket scalping.  *See* 720 ILCS 375/1.5(c); *City of Chicago v. eBay, Inc.*, No. 08 C 3281, 2009 WL 51884016, *3 (N.D.Ill. Dec. 21, 2009).

Plaintiffs are registered users of FirstDIBZ.com who, in January 2009, purchased and/or resold DIBZ for the 2009 SuperBowl in the consumer-supplied marketplace. (Compl. ¶ ¶ 1, 36-39, 45-49, 55-59, 62-67, 71-75, 83-86, 89-91, 97-100.)[3]  The DIBZ transacted by Plaintiffs ultimately proved to be fraudulent–that is, the DIBZ that Plaintiffs purchased were sold by persons who did not actually own any options to purchase tickets for the 2009 SuperBowl and had no ability to obtain the promised tickets.[4]  On behalf of themselves and those similarly situated, Plaintiffs now assert claims of breach of contract, breach of express and implied warranty, common law fraud, unjust enrichment, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1) against TTR.

Plaintiffs blame TTR for "allow[ing] fraudulent sellers to conduct transactions in the uDIBZ marketplace" by "fail[ing] to employ reasonable and available procedures and safeguards" to protect consumers from fraud.  (*Id.* at ¶ 29-31.)  TTR failed to adopt these (unidentified) reasonable protections, Plaintiffs allege, despite a previous incident in the fall of 2008 "when hundreds of

---

[3]      Plaintiffs contend that subject matter jurisdiction exists pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d)(2), because the proposed class size is more than 100 members and the amount in controversy exceeds $5 million.  None of the named Plaintiffs to this action are Illinois residents.  Plaintiffs Duffy, Adams, Jackman, and Shah are Pennsylvania residents.  (Compl. ¶ 2-9.)  Plaintiff Harder is an Iowa resident (*Id.* at ¶ 4.)  Plaintiff Lee is a Connecticut resident.  (*Id.* at ¶ 6.)  Plaintiff Ordaz is a California resident, and Plaintiff Ruggiero is a New York resident.  (*Id.* at ¶ 7-8.)

[4]      For the DIBZ sold directly by TTR on the "FirstDIBZ" marketplace, the court presumes that TTR is able to obtain ticket options for resale through its established relationships with teams, leagues and season ticket holders.  As noted, independent sellers were also permitted to sell their tickets on the consumer supplied ("uDIBZ") marketplace.  Such sales presumably would include not only re-sale of DIBZ originally purchased directly from TTR, but also sales by individuals who, because of season-ticket holder agreements or other outside arrangements, purport to have an existing independent ability to obtain particular tickets.  Indeed, the User Guide for the FirstDIBZ.com website identifies two types of persons who could sell DIBZ on the site:"1) Anyone who has purchased DIBZ in a FirstDIBZ marketplace; 2) Anyone with predetermined access to the tickets or products in FirstDIBZ marketplace (i.e. season ticket holders) can create and sell DIBZ in our uDIBZ markets." (*Id.*)  In this lawsuit, Plaintiffs allege that TTR's fraud detection policies were incapable of verifying the truth of the uDIBZ sellers' claims to have salable rights to tickets.

fraudulent DIBZ for the Chicago Cubs and Chicago White Sox to advance to the World Series were sold on the uDIBZ marketplace." (*Id.* at ¶ 30.)  According to Plaintiffs, TTR's failure to properly secure its website resulted in "hundreds and possibly thousands of fraudulent Super Bowl tickets to be sold on its online marketplace." (*Id.* at ¶ 34.)  Because of the fraud, Plaintiffs were assertedly unable to retain the value for which they resold the DIBZ or to attend the SuperBowl.  They estimate that the face value of actual SuperBowl tickets ranged from $800 to $1200 per ticket, with market values that were approximately two to three times face value for each ticket.  (*Id.* at ¶ 33.)[5]

When TTR ultimately learned that Plaintiffs had unwittingly purchased and resold fraudulent DIBZ for SuperBowl tickets, it notified Plaintiffs that all transactions involving the false DIBZ would be voided; TTR assured Plaintiffs they would be refunded the purchase price they had paid but advised Plaintiffs that they would be required to refund any proceeds derived from reselling the false DIBZ to other users.  (*Id.* at ¶ ¶ 39, 49, 68.)  On January 16, 2009, TTR further informed Plaintiffs that a "reparation plan" would be put into effect "in the hopes of making amends for the harms suffered." (*Id.* at ¶ ¶ 40. 50.)  In reliance on TTR's promise to "mak[e] amends," Plaintiffs assert, they did not attempt to purchase replacement DIBZ for the SuperBowl (why Plaintiffs assumed the "reparation plan" would include replacement DIBZ is unexplained).  On January 20, 2009–after the Arizona Cardinals and Pittsburgh Steelers had advanced to the SuperBowl–TTR announced that Plaintiffs "would not be offered a replacement DIBZ, [they] would lose [their] profit form the sale of [their] DIBZ, and [they] would not be given the option of purchasing Super Bowl tickets for face-value." (*Id.* at ¶ ¶ 42, 52.)

The complaint also alleges that TTR subsequently took possession of the money in

---

[5]     In theory, a DIBZ guarantees the buyer an opportunity to purchase a ticket at its face value price.  The price of the DIBZ does not, however, include the face value, which the buyer is required to pay separately at the time of the event.  The ultimate value of a DIBZ can therefore presumably be estimated by subtracting the face value of a DIBZ-reserved ticket from the price that a comparable ticket would have cost on the open market at the time that the event occurred.

Plaintiffs' online wallet accounts and has since refused repeated requests to release the funds.  In support, Plaintiffs attach an e-mail, dated February 26, 2009 and signed by "The FirstDIBZ Team," which states that "as a result of the fraudulent activities . . . we have been unable to honor all withdrawals in a timely manner."  (Ex. F. to Compl.)  The e-mail goes on to explain that, in order to fund the withdrawals, TTR planned to "enter a recapitalization period" to "generate enough revenue to process our payment obligations to you."  (*Id.*)  "Since January 2009," Plaintiffs assert, "Defendant has wrongfully withheld hundreds of thousands of dollars from Plaintiffs and the proposed class members by not satisfying any requests for withdrawals of money from their 'online wallets.'" (*Id.* at ¶ 108.)  Plaintiffs seek to assert class-action claims on behalf of all TTR customers who "(1) Were never refunded the price that they paid for the fraudulent DIBZ; (2) Were not provided the option to purchase a ticket to an event at face value or given the fair market value for a ticket to that event; (3) Were not able to retain profit earned from the resale of their DIBZ on the uDIBZ marketplace; and/or (4) Were not given the difference in price for a replacement DIBZ as of the date that Defendant revoked their DIBZ."  (*Id.* at ¶ 109.)[6]

> ### C.    The FirstDIBZ User Agreement

Plaintiffs' contractual claims arise out of the FirstDIBZ.com website User Agreement.  (*Id.* at ¶ 22; Ex. A to Compl.)  The agreement, binding on any user who has "comple[ed] the registration process and click[ed] the 'I AGREE' button," includes disclaimers and warranties as well as "additional terms and conditions that apply to you as a User."

---

[6]      Plaintiffs do not allege that they were formally advised that there would be no refunds for their initial purchases of the fraudulent DIBZ.  In fact, the complaint alleges the opposite: that TTR informed Plaintiffs they would ultimately be refunded the price of the fraudulent purchases and transaction fees.  Plaintiffs' claim for damages appears to be based on an estimate of the lost profits they suffered when they were compelled to refund money made reselling the fraudulent DIBZ.  Plaintiffs also contend that their actual receipt of any refund monies has been delayed by Defendant's withholding of the funds contained in Plaintiffs' online wallets.  It is unclear whether these claims are representative of the purported class, and the court reserves at this time all questions relating to class certification.

In an "Introduction" section, the Agreement explains that the "products and the rights to attend events represented by tickets, DIBZ and other instruments are granted by the league, team, event sponsor, or any other parties responsible for underwriting and staging such event or providing such products." It states, further that " FirstDIBZ facilitates the purchase and sale of those products or rights but does not act as a principal to either the buyer or seller."  The Introduction  assures users that "our payment protocol protects a seller from buyer default," but warns that TTR is not responsible for cancellation or postponement of events, for "unauthorized use of a credit card, or credit card fraud," for the safety of fans who attend events using DIBZ, or "for other matters outside our control."

The Agreement goes on to describe the two marketplaces TTR operates, and TTR's role in each.  With respect to the "FirstDIBZ-Supplied Marketplace," TTR

> stands responsible for the authenticity of Listings registered on FirstDIBZ. However, delivery of Listings is the sole responsibility of the underlying supplier. Where delivery of a Listing is refused, prevented, hindered, delayed or otherwise made impractical beyond FirstDIBZ's reasonable control and such occurrence cannot be overcome by reasonable diligence and without unusual expense, FirstDIBZ shall be excused from delivery and have the right, but not the obligation, to compensate the DIBZ holder at the close of the market with a payment equal to 125% of the average trading price of the last ten trades immediately prior to market closing for that DIBZ marketplace. Notwithstanding the foregoing, in no event shall FirstDIBZ refund a user less than what they paid for the DIBZ should delivery of the tickets not occur.

For the "Consumer-Supplied Marketplace," FirstDIBZ's role is more limited:

> FirstDIBZ acts as an exchange only in allowing registered users who want to buy Listings to find listings from registered users who want to sell Listings. Those Sellers who list their items directly in our marketplace assume responsibility for all aspects of their Listings, including but not limited to, product descriptions, identification of quantities, pricing of goods and the fulfillment of confirmed orders.  Where delivery of a Listing is refused, prevented, hindered, delayed or otherwise made impractical beyond  FirstDIBZ's reasonable control and such occurrence cannot be overcome by reasonable diligence and without unusual expense, FirstDIBZ shall have the right, but not the obligation, to compensate the Buyer at the close of the market with a payment equal to 125% of the final trading price for that DIBZ marketplace. Moreover, FirstDIBZ has the right to charge Sellers' credit card the Termination Fee as such term is defined within the Seller Agreement.

The Agreement explains, further, that if the user has "a dispute with one or more parties or

registered users," the user releases FirstDIBZ and its affiliates "from claims, demands and damages (actual and consequential) of every kind and nature, known and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or in any way connected with such dispute." The user further waives additional protections that could otherwise be available under California law.  In capital letters, the Agreement announces that it is not liable for game cancellations, for unauthorized use of credit cards, or for credit card fraud.  It also includes the following disclaimer:

> FIRSTDIBZ AND ITS SUBSIDIARIES, AFFILIATES, EMPLOYEES AND AGENTS PROVIDE ITS SOFTWARE, SITES AND SERVICES ON AN "AS IS" AND "AS APPLICABLE" BASIS WITHOUT ANY WARRANTY OR CONDITION, EXPRESS. IMPLIED OR STATUTORY.  FIRSTDIBZ AND ITS SUBSIDIARIES, EMPLOYEES, AGENTS AND SUPPLIERS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.  Some states do not allow the disclaimer of implied warranties, so the foregoing disclaimer may not apply to you.

For any claims not barred by this disclaimer, FirstDIBZ's liability is limited:

> IN NO EVENT SHALL FIRSTDIBZ BE LIABLE FOR LOST PROFITS OR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE SITES, THE SERVICES OFFERED OR THE TERMINATION OR MALFUNCTION OF THE SERVICES OR THE SITES. FIRSTDIBZ LIABILITY TO YOU OR TO ANY THIRD PARTIES IN ANY CIRCUMSTANCE ARISING OUT OF OR IN CONNECTION WITH THE SITES OR THE SERVICES OFFERED IS LIMITED TO THE LESSER OF (A) THE TOTAL U.S. DOLLAR AMOUNT OF ALL TICKETS, ITEMS OR DIBZ YOU PURCHASE AND SELL ON THE SITES IN THE 12 MONTHS PRIOR TO THE ACTION GIVING RISE TO LIABILITY AND (B) ONE HUNDRED US DOLLARS ($100.00).  Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above limitations or exclusions may not apply to you.

Finally, should a contract claim arise, the User Agreement provides that it is governed by Illinois law, and includes a forum selection clause requiring any such action to be brought in a federal or state court in Illinois.  (*Id.* at 8.)  The Agreement requires the user to indemnify FirstDIBZ against claims by third parties or the government. By its terms, the User Agreement also incorporates by reference the terms of the website's privacy policy, refund policy, user guide, and seller agreement. Plaintiffs did not provide the text of these additional incorporated policies in connection with their complaint, but they did attach the User Guide as an exhibit to their response brief. (See Ex. B to

Resp.)  The User Guide includes this language establishing a timeframe for withdrawing funds from the online wallet accounts: "Your check will be processed and mailed out 14 business days after you make a withdrawal request."  (*Id.*)

### D.      Promotional Representations on FirstDIBZ.com

In addition to the statements contained in the User Agreement, TTR also made specific claims in marketing and promoting the services offered on its website.  (Compl. at ¶ 26.)  Plaintiffs read and relied on these representations, including, for example, this paragraph in promotional materials for the 2009 SuperBowl DIBZ:

> One DIBZ guarantees one face-value ticket if your team makes it to the Super Bowl . . . . If your team makes it, so do you.  BAM! How easy is that? . . . If your team doesn't make it, you're out the price for your DIBZ and won't be getting tickets to the game.  Yes, it's kind of a bummer, but you gotta have faith in your team . . . . You can also sell your DIBZ to other fans of your team at any point during the season.  So if you can't go to the games, you've got that going for you, which is nice . . . . [SuperBowl DIBZ] give you the right and obligation to purchase face value tickets to see your team play in Super Bowl XLIII . . . From the day you buy your DIBZ up until your team is either eliminated or the market closes you have the ability to sell your DIBZ in our marketplace.

(Ex. B to Compl. at 1-2.

Plaintiffs also allege that they further relied on statements and representations contained in news articles, originally printed in third-party publications but then displayed by TTR on the FirstDIBZ.com website.  One article, originally published in *The Heights* student newspaper at Boston College, stated, "Ticket Reserve also touts as one of its advantages its high security.  Unlike scalpers, who can easily scam unknowing victims, Ticket Reserve is fully legal and guaranteed." (Ex. C to Compl.)  Another article, which originally appeared on the *MarketWatch.com* website, contained the following:

> Firstdibz.com handles all the seller-to-buyer logistics – for a 10% commission on each transaction the seller makes and 7% from the buyer for each purchase.  "We're an enabling platform," said Rick Harmon, chief executive of Firstdibz.com, who said his company does not influence ticket prices.  "We don't make markets, we just enable markets.  We're a very neutral-position platform."  Firstdibz requires sellers to guarantee the tickets before they offer them for sale.  The company promises

> buyers that they will receive tickets, even if the seller breaks the bargain.
> "Theoretically, we're not in the ticket business," Harmon said.  But if a season ticket
> holder can't be found, he said, "We go into the marketplace and we get similar or
> better tickets to deliver to the DIBZ holder."

(Ex. D to Compl.)   A third article linked to the FirstDIBZ site, initially published in the *Chicago Tribune* in July 2008, also lauded the security advantages of the website marketplace:

> For security, [TTR President Daniel] Lotzof said his company verifies a season ticket
> seller's identity with the Cubs by matching a name to an identification number
> corresponding to the ticket account.  Should the seller fail to deliver, FirstDibz will
> make good with similar tickets for the buyer while charging "market value"–likely the
> huge markups the buyer is avoiding by buying early–to the seller's credit card.

(Ex. E to Compl.)

Plaintiffs further assert that TTR's customer service representatives assured them that "DIBZ purchased on the [consumer-supplied] marketplace are the same as those purchased on the [direct] marketplace.  All DIBZ are guaranteed, so if the seller cannot produce tickets, FirstDIBZ will produce equal or better seating."  (Compl. ¶ 27.)  Plaintiffs contend that they relied on all of the above representations to their detriment by purchasing SuperBowl DIBZ with the expectation that all DIBZ exchanged on the website were secure and guaranteed.  Contrary to this expectation, Plaintiffs assert, the website was in fact "wholly lacking" in protections against fraudulent activities. (*Id.* at ¶ 123.)

Plaintiffs allege that they spent hundreds of dollars purchasing DIBZ that ultimately proved to be fraudulent.  For example, Plaintiff Ordaz purchased 18 DIBZ for the Arizona Cardinals to advance to the SuperBowl at a total price of $663.40 (*Id.* at ¶ 83.)  Plaintiff Duffy spent $593.95 to purchase three DIBZ for the Philadelphia Eagles and one DIBZ for the Arizona Cardinals to advance to the big game.  (*Id.* at ¶ 36.)  The other named Plaintiffs spent comparable amounts, typically less than $1,000 per exchange.  In total, the combined sum spent on fraudulent DIBZ by all eight named plaintiffs is less than $10,000.  (*Id.* at ¶ ¶ 36, 45, 47, 55, 58, 62, 67, 71, 83, ,89, 97.) Plaintiffs also seek to recover the lost profits they could have earned had they been able to resell

the DIBZ to other users as the DIBZ value increased.  Plaintiffs further claim punitive damages with respect to all counts of the complaint.  In total, Plaintiffs allege, they and the other members of their class are entitled to "compensatory and punitive damages in an amount in excess of $5,000,000." (*Id.* at ¶ 120.)

## DISCUSSION

### I.    Legal Standards on Motion to Dismiss

Defendant moves to dismiss all claims of the Amended Class Action Complaint pursuant to FED.R.CIV.P. 12(b)(6).  In order to survive a motion to dismiss, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED.R.CIV.P. 8(a). To survive at this stage, the claim need only be "plausible," meaning that the complaint must set forth enough facts "'to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations."  *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  The court accepts all of the Plaintiffs' factual allegations at this stage as true, but does not accord the same deference to abstract recitations of the elements of a cause of action or conclusory legal statements.  See *Ashcroft v. Iqbal*, ___ U.S.___, 129 S.Ct. 1937, 1949 (2009).  The court considers the adequacy of the challenged claims and addresses the parties' arguments with these legal standards in mind.

### II.    Breach of Contract and Warranty Claims

Plaintiffs assert claims for breach of contract and breach of express and implied warranty based on TTR's alleged failure to provide Plaintiffs with (1) the "right to purchase [SuperBowl] tickets for face value," (2) the "right to the [sic] sell or trade purchased DIBZ for a profit," and (3) adequate "protection from fraudulent transactions."  (Compl. ¶ ¶119, 123, 128.)  Plaintiffs further contend that Defendant expressly and impliedly "represented, warranted, and advertised" that FirstDIBZ.com was "a guaranteed marketplace that was adequately monitored for fraudulent activity and employed all reasonable safeguard[s] and procedures to prevent fraudulent activity from taking

11

place." (*Id.* at ¶ 127.)

Though Plaintiffs "do not concede that Illinois law applies to all of [their] claims, and specifically not their claim for implied warranty," the contract itself states that it is governed by Illinois law and both parties frame their contract interpretation arguments in that context.  (Pl.'s Resp. at 8.)[7]  Under Illinois law, a plaintiff looking to state a claim for breach of contract must allege four elements: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages."  *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir 2010).  In this case, there is no dispute that the User Agreement is a valid and enforceable contract under which Plaintiffs substantially performed by paying TTR its fees.  Nevertheless, Defendant argues, the complaint does not (and could not) adequately allege a breach by TTR because TTR assumed no duty under the User Agreement to protect Plaintiffs from fraudulent transactions on the consumer-supplied marketplace. Defendant further contends that the User Agreement disclaimed all explicit and implied warranties on which Plaintiffs claim to have relied.

A.    **Release Provisions**

The court construes the contract by giving its "unambiguous terms [their] clear and ordinary meaning in an effort to determine the parties' intent."  *Id.* at 764 (internal citations omitted).  In describing the consumer-supplied marketplace where the fraudulent exchanges occurred, the User Agreement states: "FirstDIBZ acts as an exchange only in allowing registered users who want to buy Listings to find listings from registered users who want to sell Listings.  Those Sellers who list their items directly in our marketplace assume responsibility for all aspects of their Listings,

---

[7]    The contract does appear to contemplate that the state law of the individual user's state may have an impact on the applicability of certain provisions of the User Agreement.  (See Ex. A to Compl.) ("Some states do not allow the disclaimer of implied warranties, so the foregoing disclaimer may not apply to you.")

including but not limited to, product descriptions, identification of quantities, pricing of goods and the fulfillment of confirmed orders."  Similar language is repeated and expounded upon in the "Release" in Paragraph 6 of the User Agreement:

> As discussed above, FirstDIBZ acts as a marketplace only to allow Buyers and Sellers to interact regarding Listings. The submission and confirmation of orders are transactions between Buyers and Sellers only. If you have a dispute with one or more parties or registered users, you release FirstDIBZ and all affiliated companies, officers, directors, agents, parents, subsidiaries, legal representatives and employees from claims, demands and damages (actual and consequential) of every kind and nature, known and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or in any way connected with such dispute.

(emphasis added.)  By consenting to this term, Defendants contend, Plaintiffs have released TTR from any contractual claims arising by virtue of a seller's nonperformance in the consumer-supplied marketplace.

Plaintiffs do not assert that the release provision of the User Agreement is unenforceable. Instead, they contend merely that it is inapplicable in this case.  The language of the release, Plaintiffs urge, applies only to claims arising out of disputes between buyers and sellers.  The claims in this case, Plaintiffs insist, are based on TTR's own acts and omissions in failing to ensure the integrity of its marketplace.  In light of the contract's plain language, however, the proffered distinction is not meaningful.  The unambiguous terms of the contract bar all claims against TTR "arising out of or in any way connected" with disputes between buyers and sellers in TTR's consumer-supplied marketplace.  Plaintiffs in this case have alleged that they were harmed initially by the inability of specific sellers to deliver on the terms of their promises to provide genuine ticket options.  Such a failure by the seller to "fulfill[] confirmed orders" appears to be precisely the type of "dispute" that is contemplated by the Release.  Moreover, Plaintiffs' claims against TTR for failing to prevent the fraudulent sales are undoubtedly "connected" to the initial dispute.[8]  If not for the

---

[8]     For example, the Merriam Webster Collegiate Dictionary contains the following definition of *connected*: "1: joined or linked together[,] 2: having the parts or elements logically linked together."  MERRIAM WEBSTER COLLEGIATE DICTIONARY at 244 (10th ed.. 1997).

Sellers' default, Plaintiffs would have no claim against TTR based on the integrity of the website marketplace.  Thus, Plaintiffs cannot plausibly contend that their claim is not "in any way connected" to the sellers' default.   Under the clear and ordinary meaning of the Agreement, Plaintiffs have agreed to release TTR from claims arising directly out of the fraudulent ticket sales.  Because the release provision is unambiguous and because Plaintiffs have not alleged that it is unenforceable, it acts to limit their claims in this area.  Plaintiffs' claim for breach of contract arising out of TTR's failure to prevent the specific fraudulent transactions is dismissed.

Plaintiffs' alternative claim for breach–arising out of TTR's refusal to release the funds from Plaintiffs' online wallet accounts–may have more traction.  Under the incorporated terms of the contract, TTR appears to have assumed an unqualified duty to "process[] and mail[] out" funds from online accounts within "14 business days after [a user] make[s] a withdrawal request."   The language describing this contractual duty does not contain any limitation, and the claim does not appear to be barred by the Release provision as it has no immediate connection to any dispute between Plaintiffs and the fraudulent sellers.  Though TTR initially attributed its inability to honor withdrawal requests to "fraudulent activities," the reasonable inference drawn for Plaintiffs at this stage is that the withholding of account funds was not "in any way connected" to a buyer/seller dispute.  The letter sent by the FirstDIBZ Team appears to acknowledge that the immediate cause of TTR's failure to timely disburse account funds is the company's own insufficient capitalization. (Ex. F. to Compl.)  The alleged harm to Plaintiffs occasioned by TTR's prolonged failure to comply with the terms of its withdrawal policy is sufficiently distinct from the harm occasioned by the initial fraudulent sales.  Plaintiffs have alleged that TTR seized and withheld "hundreds of thousands of dollars" in violation of the User Agreement.  What proportion of those funds may be connected to the original fraudulent transactions is unclear, but with respect to those withheld funds that were generated by TTR's customers' legitimate transactions, the release does not bar Plaintiffs' claims for recovery.  Plaintiffs' breach of contract claim stemming from the improper withholding of account

funds is sufficient to survive the motion to dismiss.

Although this claim survives the challenge based on the release language, the court notes an additional concern: subject matter jurisdiction. Plaintiffs have invoked the Class Action Fairness Act, 28 U.S.C § 1332(d)(2), as a basis for jurisdiction, but that Act which requires that the amount in controversy exceed $5 million. Plaintiffs here have alleged only that "hundreds of thousands of dollars" of funds belonging to the potential class members have been improperly withheld by TTR. Plaintiffs are directed to amend the complaint to allege the basis for this court's subject matter jurisdiction.

## B.      Provisions Disclaiming Warranties and Limiting Liability

Plaintiffs have also asserted claims based on express and implied warranties under the User Agreement. Specifically, they allege that TTR "guaranteed" the transactions on its website and warranted that it had undertaken sufficient precautions to protect its customers from fraudulent transactions. Defendants contend that the "Disclaimer of Warranties" and "Limitation of Liability" provisions, found in paragraphs 13 and 15 of the User Agreement, unambiguously prohibit Plaintiffs from pursuing and recovering on any such claims.[9] The Disclaimer of Warranties excludes any claim based on a warranty and cautions that the services on the website are provided on an "'as is' and 'as applicable' basis without any warranty or condition, express, implied or statutory." In their Response Brief, Plaintiffs assert that the disclaimer and limitation provisions are

---

[9]      The Limitation of Liability provision purports to cap Defendant's liability for all claims "arising out of or in connection with" use of the FirstDIBZ.com website at $100 per claimant. The court notes that this cap creates a further question regarding subject matter jurisdiction under the Class Action Fairness Act. Plaintiffs do not allege in their complaint that this provision is unenforceable as applied either to the named Plaintiffs or the other potential members of their class. Assuming the limitation of liability clause is valid and enforceable, it would appear to curtail Plaintiffs' potential recovery in this case. Absent a showing that there are 50,000 class members who have suffered $100 in damages, the amount in controversy would fall below the requisite amount under 28 U.S.C § 1332(d)(2). As a general matter, a party seeking to invoke federal jurisdiction bears the burden of demonstrating its existence. *See Hart v. FedEx Ground Package System Inc.*, 457 F.3d 675, 679 (7th Cir. 2006). Plaintiffs will be expected to address this issue in any amended complaint.

unenforceable.  They cite Illinois's version of the Uniform Commercial Code, 810 ILCS 5/2-316, under which such warranty limitations are enforceable only if they may be reasonably construed with the remainder of the contract and are sufficiently conspicuous.

The court concludes that each of these tests is met.  The disclaimer can be reasonably construed in conjunction with the integrated terms of the User Guide, which state *inter alia*: "One DIBZ guarantees one face-value ticket" and "You can sell your DIBZ to other fans of your team at any point during the season."  Those provisions provide the holders of genuine DIBZ with access to certain rights (i.e. selling or trading); they do not make any warranties about the security of the website, nor do they guarantee that every DIBZ transacted on its website is genuine.  The references to "guarantee[d]" rights in these provisions, therefore, are not "expanded warranties" or "extensive obligations" that render the explicit disclaimer of warranties inoperative.  *Cf. Heat Exchangers, Inc. v. Aaron Friedman*, Inc. 96 Ill. App. 3d 376, 386, 421 N.E.2d 336, 343 (1st Dist. 1981) (warranty to "repair all defects" rendered inoperative a more limited inconsistent warranty to "furnish replacement parts").  In this case, the Disclaimer of Warranties is not inconsistent with any other contractual provision.

Nor have Plaintiffs alleged that the disclaimers in the User Agreement were either inconspicuous or were rendered unconscionable by other circumstances existing at the time of the contract's formation.  *See CogniTest Corp. v. Riverside Pub. Co.*, 107 F.3d 493, 499 (7th Cir. 1997) ("In assessing whether a contractual provision should be disregarded as unconscionable, Illinois courts look to the circumstances existing at the time of the contract's formation, including the relative bargaining positions of the parties and whether the provision's operation would result in unfair surprise.") (cited by *MAN Roland Inc. v. Quantum Color Corp.*, 57 F.Supp. 2d 568, 575 (N.D.Ill. 1999)).  Even if the court were to infer that a disparity of bargaining power existed between TTR and the Plaintiffs as individual consumers, the complaint has failed to allege any remaining circumstances surrounding the formation of the contract that might bear on the enforceability of the

16

disputed provisions.

If anything, the factual content that is alleged undermines the Plaintiffs' assertions that portions of the contract are unenforceable, unconscionable, or inconspicuous.  For example, the complaint alleges that each named Plaintiff read the User Agreement in its entirety and relied on the statements contained therein throughout his subsequent use of the website.  There is no allegation that any Plaintiff did not understand the Disclaimer of Warranties or Limitation of Liabilities provisions or that any Plaintiff considered those provisions to be inconsistent with other representations made elsewhere by TTR.  Nor does the complaint allege that any Plaintiff relied on the explicit caveat contained in the provision that the "limitations or exclusions may not apply to you."

In short, Plaintiffs' argument that specific provisions of the contract are unenforceable is neither contemplated nor supported by their complaint.  A plaintiff may not supplement or amend his complaint by presenting new facts or theories in his briefing in opposition to a motion to dismiss. *See, e.g., Bissessur v. Indiana University Bd. of Trustees*, 581 F.3d 599, 603 (7th Cir. 2009) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1103 (7th Cir. 1984)).  Plaintiffs' claims for breach of explicit and implied warranties are therefore dismissed.

### III.    Common Law Fraud and the Illinois Consumer Fraud Act Claims

Plaintiffs also assert fraud claims based on the common law and on Illinois' Consumer Fraud Act.  Defendant contends that these claims are barred by the express terms of the User Agreement and constitute an improper restatement of Plaintiffs' contractual claims.  The court turns now to these arguments.

#### A.    Contrary Contractual Representations

Defendant seeks to dismiss Plaintiffs' fraud claims as foreclosed by the language of the User Agreement.  Plaintiffs assert that they were misled by fraudulent misrepresentations contained within TTR's promotional materials and statements by the company's customer service

representatives, which claimed that "[a]ll DIBZ are guaranteed, so if the seller cannot produce tickets, FirstDIBZ will produce equal or better seating."  As described, however, the User Agreement explicitly releases TTR from all liability resulting from a seller's failure to produce tickets as promised.  Specifically, the contract bars all claims against TTR that stem from a dispute with a seller, including a seller's failure to "fulfill[] a confirmed order."  Thus, the contract explicitly repudiates any contention that TTR assumed an affirmative responsibility to produce substitute tickets in the event of a seller's default.

In order to state a claim for common law fraud under Illinois law, a plaintiff must allege: (1) the defendant made a false statement of material fact; (2) the defendant knew the statement to be false; (3) the defendant made the statement intending to induce the plaintiff to undertake some act; (4) the plaintiff reasonably relied upon the truth of the statement; and (5) the plaintiff suffered damages as a result of his reliance.  *See Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 675 N.E.2d 584, 591 (1996).  The presence of an explicit contractual term that contradicts an extrinsic false statement, however, renders any subsequent reliance by the plaintiff unreasonable as a matter of law.  *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1208 (7th Cir. 1998).  "It is an elementary principle of contract law that [a party] may not enter into a transaction with [its] eyes closed to available information and then charge that [it] has been deceived by another.  As long as the complaining party could have discovered the fraud by reading the contract and had the opportunity to do so, Illinois courts have refused to extend the doctrine of fraudulent inducement to invalidate contracts."  *Cozzi Iron & Metal, Inc. v. United States Office Equipment, Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (internal quotation marks and citation omitted).

In *Cozzi*, a lessee claimed to have relied on representations by leasing agents that were plainly contradicted by the express terms of the lease agreement.  Given that the lessee had ample opportunity to review the contract before signing it, the court concluded that the lessee could not state a claim for common law fraud.  Here, similarly, Plaintiffs claim to have relied on sales and

promotional representations that are directly controverted by the governing contractual language. The contract specifically excuses TTR from any legal duty to provide substitute tickets or other compensation in the event of a seller's default.  Plaintiffs not only had ample opportunity to read the release and disclaimer provisions; they allege that they actually did in fact read and rely on these provisions.  Thus, even assuming that all of the alleged misrepresentations are attributable to Defendant, the presence of directly contradictory contractual language renders Plaintiffs' reliance unreasonable and undermines Plaintiffs' common law fraud claim.[10]  The claim is dismissed.

**B.      Repetition of Contract Claims**

Plaintiffs' Illinois Consumer Fraud Act claim is vulnerable to dismissal for another reason. As Defendants correctly assert, that claim is merely a restatement of Plaintiffs' contractual claims. Under Illinois law, a breach of a contractual promise, without more, is not actionable under the Consumer Fraud Act.  *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill.2d 100, 169, 835 N.E.2d 801, 844 (2005).  Applying this principle in *Shaw v. Hyatt Intern. Corp.*, the Seventh Circuit found that a user of a hotel chain's website had no consumer fraud claim against the hotel chain when it overcharged the user for a booking and thereby broke its contractual "promise as to the [room's] price."  461 F.3d 899, 902 (7th Cir. 2006).  The court reasoned that the customer's fraud claim relied "exclusively on the express promises made by the Hyatt website, which he

---

[10]        The same rationale does not immediately doom Plaintiffs' Illinois Consumer Fraud Act claim because reliance is not required to establish such a claim.  *See Cozzi*, 250 F.3d at 576 (collecting cases).  Instead, to state a claim under the Consumer Fraud Act a Plaintiff need only allege: (1) a deceptive act or practice by the defendant; (2) that the defendant intended for the plaintiff to rely on the deception; and (3) that the deception occurred in the course of conduct involving trade or commerce.  *Connick*, 221 Ill. Dec. 389, 675 N.E.2d at 593. Plaintiffs have satisfied these elements by alleging several false representations made by TTR customer service agents and promotional materials regarding the security and guaranteed nature of transactions on the FirstDIBZ.com website.  Therefore, because reasonable reliance is not a pleading requirement to state a claim under the Illinois Consumer Fraud Act, the existence of contradictory contractual language does not necessarily undermine Plaintiffs' facially adequate pleading.  *See Cozzi*, 250 F.3d at 575-77.  As the court explains in Part B, however, there is a strong alternative basis for dismissing the consumer fraud claim.

accepted by booking on its site, and therefore is based entirely on the breach of that contract." *Id.* at 902.

Like the customer in *Shaw*, Plaintiffs assert that they relied on express representations made on the FirstDIBZ.com website, which they accepted by conducting transactions on the site. Similarly, Plaintiffs' consumer fraud claim seeks to enforce an unfulfilled contractual promise. Described in the simplest terms, Plaintiffs' claim consists of allegations that they were defrauded by third-party sellers on the FirstDibz.com website and that TTR did not do enough as the operator of the website to protect Plaintiffs from being victimized. If TTR has any duty to protect Plaintiffs, however, its obligations exist incident to its performance under the User Agreement. TTR contracted with its customers to provide a market service in a particular manner. At its core, Plaintiffs' fraud claim rests on the contention that TTR's performance was unsatisfactory. The Consumer Fraud Act was not intended, however, to supplement every claim based on unsatisfactory contractual performance with a redundant remedy. *See Zankle v. Queen Anne Landscaping*, 311 Ill.App.3d 308, 310-12, 724 N.E.2d 988, 991-93 (2nd Dist. 2000) (no consumer fraud claim against a landscaper whose performance of its contractual duty to provide lawn care was "unsatisfactory in several respects.") Plaintiffs have alleged the existence of a contract that governs the mutual obligations between TTR and its customers. (Compl. at ¶ 118.) They have further alleged that TTR's "failure to perform such services consistent with its contractual duties" was the proximate cause of Plaintiffs' harm. (Compl. at ¶ 119-120.)[11] What Plaintiffs call consumer fraud is really an allegation that the Defendant failed to properly fulfill its contractual obligations in

---

[11]       Plaintiffs argue in their brief that their breach of contract and fraud claims are pleaded in the alternative, as permitted under the Federal Rules. Plaintiffs' argument mischaracterizes the complaint, however, which "incoporate[s] by reference all other paragraphs of this Complaint" for each of the counts stated. (Compl. ¶ 140.) Moreover, the Federal Rules' permissive attitude toward inconsistent pleading does nothing to alter the Illinois Supreme Court's decree that a plaintiffs' consumer fraud claim may not, as a matter of law, be predicated upon a defendant's breach of a contractual promise. *See Avery*, 216 Ill.2d. at 169-70, 835 N.E.2d at 844.

administering its online marketplace.  Plaintiffs' claim based on the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, is dismissed.

## IV.    Unjust Enrichment Claim

Defendant moves to dismiss Plaintiffs' claim for unjust enrichment for similar reasons: unjust enrichment is a quasi-contractual theory of recovery that ordinarily is not available where an express contract exists.  *See  People ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill.2d 473, 497, 607 N.E.2d 165, 177 (1992) (quoting *La Throp v. Bell Federal Savings & Loan Association*, 68 Ill.2d 375, 391, 370 N.E.2d 188, 195 (1977)).   Thus, when two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract. *Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004).   In determining whether a claim falls outside a contract, the court considers the subject matter of the contract rather than the contract's specific terms or provisions.  *Id.* at 689.  A party whose contractual expectations were not realized may not make an end run around contract law by pursuing an unjust enrichment theory.  *Id.; see also  Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003).

Plaintiffs' complaint acknowledges that an express contract covers the subject matter of their claims: the administration of the FirstDIBZ.com marketplace and the duties TTR owes to the users its website.  In fact, the unjust enrichment claim expressly incorporates Plaintiffs' contractual allegations. (Compl. at ¶ 149) (incorporating "all other paragraphs.")  Under Illinois law, Plaintiffs' contractual allegations are simply incompatible with their unjust enrichment claim.  *See, e.g., Guinn v. Hoskins Chevrolet*, 361 Ill.App.3d 575, 604, 836 N.E.2d 681, 704 (2005) ("[W]hile a plaintiff may plead breach of contract in one count and unjust enrichment in others, it may not include allegations of an express contract which governs the relationship of the parties, in the counts for unjust enrichment and promissory estoppel."); *Prudential Ins. Co v. Clark Consulting Inc.*, 548 F.Supp.2d 619, 643 (N.D.Ill. 2008) ("The law is clear that [a plaintiff] cannot recover under both a breach of

contract theory and an unjust enrichment theory.") Count VI is dismissed.

The court will grant Plaintiffs leave to file an amended complaint. Recognizing that they may seek to reassert their claim for unjust enrichment, the court cautions that even under a broad understanding of such a claim, it does not appear applicable here.  To state a claim for unjust enrichment, Plaintiffs will need to allege that Defendant has "unjustly retained a benefit" to their detriment, or that a benefit to which they were entitled was improperly transferred to Defendant. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145, 160, 545 N.E.2d 672, 679 (1989).  Plaintiffs' allegations make clear that persons who sold uDIBZ to Plaintiffs were unjustly enriched: Plaintiffs paid those sellers for tickets to which the sellers had no rights.  Plaintiffs believe Defendant was responsible for their loss, but have not explained how Defendant was enriched–unjustly or otherwise–by the wrongdoing.

## CONCLUSION

Defendant's motion to dismiss [35] is granted in part and denied in part.  The following claims are dismissed with leave to amend: (1) breach of contract based on TTR's failure to prevent specific fraudulent transactions [Count I]; (2) breach of express and implied warranties [Counts II and III]; (3) common law fraud [Count IV]; (4) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 [Count V]; and (5) unjust enrichment [Count VI]. The motion is denied with respect to Plaintiffs' claim for breach of contract based on Defendant's improper withholding of online account funds [Count I].  Plaintiffs will have leave to file an amended complaint within 21 days; the court notes that any such complaint must include allegations that satisfy the court that it retains subject matter jurisdiction.

ENTER:

Dated:  July 6 , 2010

_____
REBECCA R. PALLMEYER
United States District Judge